# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| RICHARD MEREDITH, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | No. 4:03-CV-959 CAS |
| v. ) | |
| ) | |
| PACCAR, INC., et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on defendants' motions to bar the testimony of plaintiffs' expert witnesses and to dismiss for spoilation of evidence. The motions are briefed.[1] After careful review of the briefs and the record material, the Court will deny the motions for the reasons set forth below.

This products liability action arises out of a single vehicle accident that occurred in northeastern Missouri on June 30, 1997. Richard Meredith claims the left taper leaf spring of his 1988 Peterbilt tractor failed, causing him to lose control of the vehicle, veer off the roadway, roll over and crash into an adjacent drainage ditch.

The plaintiffs are Meredith, the owner operator of the tractor; Bonnie Meredith, his wife; and Piasa Motor Fuels, Inc., Richard Meredith's employer and the owner of the attached fuel trailer involved in the accident. They seek damages under theories of strict liability and negligence, alleging

---

[1]The parties have submitted an extensive evidentiary record, including experts' reports and deposition excerpts. Accordingly, despite the parties' request for oral argument, the Court finds that it can make a proper Daubert analysis without the need for an evidentiary hearing or oral argument.

the Peterbilt tractor manufactured by defendant PACCAR, and the spring manufactured by defendant Winnemac, Inc., were defective and unreasonably dangerous in that the spring fractured and was improperly designed and/or manufactured.

The product at issue is a 1987 vintage taper leaf spring manufactured by Winnemac. It has two leafs. The main leaf has an eye formed at each end of the leaf through which a pin is inserted to attach the spring to the truck chassis. The secondary or outer leaf is pinned to the main leaf at the back end with rivets and is formed so that at the forward attachment point, this leaf wraps around the eye of the mainleaf such that if the main leaf should break, the secondary leaf is wrapped around the eye connection to retain the spring in place.

    **A.**    **Motion to exclude testimony of Mark Ezra**

Defendants first move to exclude the expert testimony of Mark Ezra, a mechanical engineer. Ezra opines, *inter alia*, that (1) the fracture of the truck taper leaf spring in question was caused by abnormal wear thereby reducing the spring's strength so it could not withstand "normal" loading; (2) the failure of the taper leaf spring disabled the truck's steering control; and (3) the curvature of the upper leaf spring was defective in design and manufacturing because it was not in accordance with Society of Automotive Engineers ("SAE") requirements.

The admission of expert testimony in federal court is governed by Federal Rule of Evidence 702. Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001). "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony." Weisgram v. Marley Co., 169 F.3d 514, 523 (8th Cir. 1999), aff'd, 528 U.S. 440 (2000). The Rule "favors admissibility if the testimony will assist the trier of fact." Clark v. Heidrick, 150 F.3d 912, 915 (8th Cir. 1998). Doubt regarding "whether an expert's testimony will be useful should generally be resolved in favor of

admissibility." Id. (citation and internal quotation omitted).

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the United States Supreme Court interpreted Rule 702 to require district courts to be certain that expert evidence based on scientific, technical or other specialized knowledge is "not only relevant, but reliable." Daubert, 509 U.S. at 589. The district court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology can be applied to the facts in issue." Daubert at 592-93.

The Eighth Circuit has explained that proposed expert testimony must meet three criteria to be admissible under Rule 702:

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires . . . .
>
> The basis for the third prerequisite lies in the recent amendment of Rule 702, which adds the following language to the former rule: '(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.' Fed. R. Evid. 702.

Lauzon, 270 F.3d at 686 (internal citations and punctuation omitted).

Daubert lists several nonexclusive factors a court may examine in performing its "gatekeeper" role of screening expert testimony for relevance and reliability. These are (1) whether the theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory has

been generally accepted. Lauzon, 270 F.3d at 686-87 (internal citations and punctuation omitted). Additional factors which have been developed in subsequent cases include "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." Id. (citations omitted). The Daubert list of factors is not exclusive, and does not function as a definitive "checklist or test." Daubert, 509 U.S. at 593-94. Instead, the trial court retains great flexibility in customizing the analysis to fit the facts of each case. See Jaurequi v. Carter Mfg. Co., Inc., 173 F.3d 1076, 1083 (8th Cir. 1999).

Defendants assert that Ezra's testimony are not based on a "reliable foundation" under the standards for admissibility set forth in Daubert. They argue Ezra has no background or experience with heavy trucks, taper leaf springs or the application of the SAE guidelines in the design of taper leaf springs; that there is no support for Ezra's theories in literature or cases; Ezra has not performed any tests or analyses to support his conclusions nor has he identified any reliable scientific or competent engineering analysis or test data that supports his opinions.

Defendants challenge Ezra's qualifications, arguing he has no experience or background with heavy truck leaf springs or taper leaf spring failure. They further argue he has no experience with the SAE guidelines routinely referred to by spring designers and manufacturers, or with heavy trucks like the one driven by Meredith. In addition to his purported lack of qualifications, defendants claim Ezra has failed to perform a single mechanical engineering test or analysis on the design of the taper leaf spring in question, the performance of the taper leaf spring based on the design and loading conditions of and the performance of a Peterbilt tractor with a fractured taper leaf spring. They note he has not attempted to quantify the "normal loads" the spring would be subjected to on a paved roadway nor

4

the resulting stress in the spring at the point at which it was found to be fractured after the accident, stating that all he has done is look at a few parts of the truck retained. Finally, defendants argue Ezra has failed to consider or eliminate alternative causes of the spring's failure, including the obvious cause, i.e., the crash.

Plaintiffs first note that Ezra was initially retained by Piasa's insurer, Fireman's Fund, to examine the vehicle and determine whether any mechanical failure led to the accident. They counter that Ezra is a well-qualified mechanical engineer with extensive experience in failure analysis and accident investigation. They note that when initially retained by Fireman's Fund, Ezra inspected the subject tractor at the Piasa facility where it had been taken after recovery. He took numerous photographs to document his findings. After his inspection, he learned that the vehicle had been released for salvage. Upon learning this, he requested and received the subject spring assembly and brackets. He requested a metallurgical analysis of the spring fracture from Briem manufacturing.

They further argue Ezra's methodology is substantially similar to the methodology employed by defendants' experts. They note that at no time did Ezra nor anyone else have an opportunity to examine the vehicle at the accident site. They also note that accident reconstructions were not performed by anyone because there was no need to do so as accident reconstructions are designed to determine direction and speed, which are not at issue in this case. They contend that even though Ezra has not specialized in the study of heavy truck leaf springs, his experience and specialization in failure analysis is sufficient for him to opine concerning the mechanism of failure in this case.

"The only question relevant to the admissibility of . . . scientific evidence is whether it is sufficiently reliable and relevant to assist the jury's determination of a disputed issue." Bonner, 259 F.3d at 929 (citing Daubert, 509 U.S. at 594-595). The Court concludes that Mr. Ezra's testimony

meets this standard. Defendants' assertions concerning flaws in his qualifications and methodology are proper subjects for defendants' own expert testimony and for thorough cross-examination before the trier of fact. Therefore the Court will deny defendants' motion to exclude the testimony of Mark Ezra.

**B.      Motion to exclude testimony of James Briem**

Defendants next move to exclude the testimony of plaintiffs' expert James Briem, a metallurgist, who will offer opinion testimony in an attempt to satisfy plaintiffs' burden to prove that (1) the spring fractured prior to the accident; and (2) the fracture of the spring caused the accident. They argue Briem is not qualified to testify concerning the timing of the fracture or the cause of the accident. The note Briem admits he did not conduct a complete accident investigation, and that Briem is relying on unsubstantiated assumptions and circular reasoning as the bases for his opinions, and as a consequence, his proposed opinion testimony is not sufficiently reliable or related to the facts of the case such that its admission would aid the jury in resolving any factual dispute.

Defendants state that in October 1997, Briem received the spring and two spring hangers. Dr. Christopher Kocher, a Senior Engineering Analyst at Briem's firm, examined the parts and produced a report dated October 24, 1997, in which he found that a one-time overload, as opposed to fatigue or other time-dependent loading, caused a fracture of the spring and the bracket. Briem reviewed and signed off on this report. Approximately seven years later, Briem himself produced a second report dated June 29, 1994, in which he concluded the spring suffered from a one time dependent fracture mechanism known as "fatigue," and that a complete fracture occurred when the spring's strength had been reduced by wear and fatigue, such that it 'could not withstand one more normal, operational, load cycle." He attributed the wear and fatigue to "normal operation of the

6

vehicle" and opined that there was a "hidden defect." At the same time, however, Briem acknowledged that the forces applied to the vehicle in the course of the accident were sufficient to break the spring and that the spring may have, in fact, simply fractured in the course of the accident.

As to Briem's qualifications, defendants argue Briem has never designed a taper leaf spring, consulted with a spring manufacturer regarding the design of a taper leaf spring, or tested the design of such a spring. Defendants argue although Briem is arguably qualified to testify based on his training and experience as a metallurgist to express opinions about the fatigue crack he found at the fracture site, the hardness of the metal in the spring, and the strength of the material, he is not qualified to testify regarding either the timing of the fracture or the cause of the accident. They argue that his theory is not only not supported by the facts, but is contradicted by his own firm's earlier report. They argue Briem is unable to provide any objective validation for his methodology in reaching these opinions; instead he essentially requests that the Court defer to his experience and knowledge as independent verification for the soundness of his theories. The also contend his claim that wear and tear led to a failure of the spring is incompatible and inconsistent with the finding that a "one-time overload" did.

Plaintiffs reply that Briem's methodology is substantially similar to the other two metallurgists proffered by defendants. They note that although Briem has not previously designed or tested a leaf spring or consulted with a spring manufacturer regarding such a spring design, or tested such a spring's design, he is a metallurgical engineer with over 25 years in failure analysis and metallurgical testing. Plaintiffs note defendant Paccar's experts have also have little prior experience with analyzing truck leaf spring failure, nor have they ever designed or had anything to do with the manufacture of leaf springs. They claim that Briem's extensive experience as a metallurgist, other

7

than in an investigative and consulting capacity, make him amply qualified to opine about the timing and cause of the failure at issue.

As to his methodology, plaintiffs argue Briem reached his opinions using accepted methodology employed by metallurgists and engineers who engage in failure analysis. As to defendants criticism that his report purportedly contradicts an earlier report authored by his colleague Christopher Kocher, they note that while it is true as Kocher reported, that the final fracture was a "one-time overload," it is caused by reduction in strength resulting from wear and fatigue. They point out that defendants fail to note that Kocher did not conclude the fracture was caused by the rollover. Plaintiffs also argue Briem, unlike defendants' experts, considered Meredith's statements in determining whether the leaf spring fractured prior to the accident or as a result of the accident. They argue Briem considered the totality of the evidence in reaching his conclusions, rather than relying solely on simplistic calculations that have little relevance in actual loading conditions in the field.

In light of the standards set forth in <u>Daubert</u>, the Court concludes Mr. Briem's testimony meets the standards for admissibility set forth above. Defendants' motion to exclude the testimony of James Briem will be denied.

  **C. Motion to Dismiss for Spoilation of Evidence**

Defendants also move to dismiss plaintiffs' claims against defendants for spoilation of evidence. Defendants argue plaintiffs are attempting to prove their claims through the testimony of mechanical engineer Mark Ezra, discussed above. Ezra seeks to opine that during the normal operation of the Peterbilt tractor on the paved roadway, the taper leaf spring discussed above suddenly fractured causing the steering of the vehicle to jam, resulting in Meredith's loss of control

8

and the accident.

As discussed above, Ezra was initially retained by Fireman's Fund, the insurer of both the tractor and trailer to inspect the wreckage to see if he could find mechanical defects. Ezra examined the tractor an trailer and took some photographs, but did not attempt to fully document their condition through photographs or notes. Ezra assumed they would be retained as evidence. Defendants complain Ezra did not inspect, photograph, test or document in any way the steering system, which he now says jammed and caused the accident.

Defendants state Ezra admitted the importance of retaining the vehicle for evidence at his deposition and his expectation that if claims were anticipated, the tractor would be preserved for others to test and inspect. Yet, sometime after his inspection when he learned that the tractor and trailer were be in salvaged, he did not ask that they be retained or that any part of the steering system be retained. He did not ask for an additional opportunity to inspect, photograph and document the tractor or trailer. Instead, he only requested that the left front taper leaf spring and two spring hangers be removed from the vehicle.

In support of their motion, defendants assert Ezra has now testified that the tractor's steering jammed as a result of movement and "drop" of the steering box when the spring broke. He has testified that he observed a bent drag link on the tractor after the accident, which he asserts supports his opinion that the spring broke *prior* to the crash. Ezra has suggested the tie rod of the vehicle was damaged when the spring broke; nonetheless he did not ask that the drag link or any of the steering components of the tractor be retained, and the plaintiffs disposed of the vehicle.

Meredith owned the tractor at the time of the accident, and Piasa owned the trailer. Title to the tractor was signed over to Fireman's Fund, and plaintiff's then allowed the insurer to take and

9

dispose of the wreckage, including the tractor steering system, and the remainder of the suspension system, including the right taper leaf spring and the rest of the tractor, as salvage.

Defendants claim that even though the plaintiffs had control of the tractor and trailer following the accident, they failed to retain or request the retention of any part of the steering system, the drag link, tie rod, or the matching taper leaf spring from the right side of the vehicle or any other part of the vehicle or trailer, which could have provided significant evidence concerning the sequence and cause of the accident.

Defendants state they have jointly retained a mechanical engineer, Fred Monick, to evaluate and respond to plaintiff's claims. Monick has identified 13 things that, but for the salvaging of the subject tractor and trailer, he would have tested or documented during an inspection in order to respond to plaintiff's allegations. Monick has noted that the photographs taken by Ezra are insufficient to enable him to obtain the required information. Given the opportunity, defendants contend Monick could have obtained key evidence from the tractor and trailer that would have enabled him to directly test the claims of plaintiffs and their experts.

Defendants argue plaintiffs permitted the destruction of evidence critical to evaluating their claims and the opinions of their retained engineer. They argue the plaintiffs had possession of and access to the tractor and trailer and now seek to pursue a claim based on testimony from a purported expert who had full access to and relies on the evidence they allowed by destroyed. They claim that without the ability to see, document and test the assembled tractor and its suspension and steering system, a full defense is not possible. They note that plaintiffs' experts will, if permitted, testify that the fractured leaf spring caused a steering problem, yet they disposed of the crucial evidence while denying defendants' experts the ability to evaluate or disprove plaintiffs' theories.

Defendants argue plaintiffs' disposing of the tractor and trailer have severely prejudiced them as it is inherently unfair to allow plaintiffs to pursue a claim of defect in evidence they allowed to be destroyed. They ask the Court to dismiss plaintiffs' claims, and alternatively to exclude Ezra and Briem's testimony, photographs, inspections, and reports. They argue that judgment in their favor is the appropriate remedy because plaintiffs and their expert had possession of and access to the tractor, knew or should have known litigation was likely, knew the vehicle and its post-impact condition were relevant, and knew disposal of the vehicle would prejudice any party against whom a claim was made. They finally note that the prejudice too them is to severe to expect a jury instruction to reedy it.

Plaintiffs oppose the motion. In support they state the following. On August 21, 1997 Ezra inspected the tractor at the Piasa facility where it had been taken after recovery. After the inspection, Ezra learned that Fireman's Fund had released the vehicle for salvage. Upon learning of this fact, he requested and received the subject broken spring assembly and brackets. He the sent the broken leaf spring to metallurgist Briem's firm for further metallurgical examination.

Examination of the spring revealed that the spring fractured at a point adjacent to the front eye where a pin is used to attach the spring to a bracket which is attached to the frame of the truck. Examination of the fracture site revealed the presence of a fatigue crack. That fatigue crack was the initiation point of the fracture. Examination also revealed extensive wear as a result of contact between the primary or main spring leaf and the secondary leaf. Approximately one-third of the material had been lost due to wear.

At no point did Ezra have possession or control of the vehicle, nor did he have the ability to order that the vehicle be retained. When he was conducting his initial investigation, Ezra had not

11

been retained by plaintiffs to serve as a consulting or testifying expert of any kind. He was conducting a routine investigation on behalf of plaintiff's insurer.

The vehicle was salvaged while Meredith was recovering from the accident and before he contemplated litigation or retained counsel. The Merediths were not advised by anyone that preserving the vehicle would be required or advisable for further investigation into the cause of the accident. They did request that the spring be retained because from their own observation of the vehicle, they concluded that it may have had something to do with the accident.

Plaintiffs note that it is undisputed that the subject spring fractured. All parties have had an opportunity to examine, test, measure, and photograph the subject spring in depth. Neither Paccar nor the third-party defendants have ever requested permission to subject the spring to any further testing. All parties have also had an opportunity to examine the spring brackets and various connectors, and again, no party has ever sought permission to subject those brackets to any other kind of testing. Plaintiffs note that issue is whether the spring fractured due to a design defect that made it susceptible to fatigue failure, or as defendants assert, due to a one time overload as a result of the accident. They note that (1) Ezra was able to reach his conclusions and opinions relying on the same physical and photographic evidence available to all parties; (2) that with the exception of Monick, none of the other expert witnesses in this case needed to examine the tractor or tanker to reach their conclusions; and (3) every expert witness retained by the defendants was able to reach his opinions without benefit of any further physical evidence. They also note that there is physical evidence available for Monick's investigation, the spring, and that Monick never examined the spring in reaching his conclusions. The note that the rescue and recovery operation itself likely damaged the vehicle and it is speculative to say that the vehicle would have revealed what damage existed

12

because of the accident and which existed prior to accident.

A court's inherent power includes the discretionary "ability to fashion an appropriate sanction for conduct which abuses the judicial process." Chambers, 501 U.S. 32, 44-45 (1991). There must be a finding of prejudice to the opposing party before imposing a sanction for destruction of evidence. Dillon v. Nissan Motor Co., Ltd., 986 F.2d at 267. In Dillon the Eighth Circuit affirmed the imposition of sanctions--largely the exclusion of evidence--for the destruction of evidence where there was no bad faith finding regarding the spoliation of evidence but only a finding that the spoilators, including plaintiff's counsel, "knew or should have known" that the evidence would be relevant to imminent litigation. The Eighth Circuit noted in a footnote discussing the sanction of exclusion of evidence that, although the trial court did not make a bad faith finding, the facts of the case "might have supported a finding of bad faith and at least similar, if not more severe, sanctions [than the exclusion of evidence] under Rule 37." Id. at 269 & n. 3. The Dillon court did not discuss whether a finding of bad faith or intentional destruction was necessary to impose the specific sanction of an adverse inference instruction.

Plaintiffs claim the circumstances here are distinguishable from those in Dillon. They note that here the plaintiffs did not have the benefit of counsel by the time the tractor was salvaged by their insurer. Moreover, there is no evidence in the record to suggest that plaintiffs had any anticipation of litigation when the tractor was salvaged by their insurer. Nor is there any evidence to suggest that plaintiff's insurer had any anticipation of litigation when the tractor was salvaged. Also, unlike the expert Dillon, the plaintiffs' experts had no control over or played any role in the salvage of the tractor wreckage.

An adverse inference instruction is warranted only when there is "a finding of intentional

13

destruction indicating a desire to suppress the truth" and prejudice to the opposing party. Stevenson v. Union Pacific R.R. Co., 354 F.3d 739, 746-48 (8th Cir.2004). Stevenson clarified what circumstances justify the sanction of an adverse inference instruction. Stevenson specifically addressed the pre-litigation destruction of documents pursuant to Union Pacific's document retention policy. While acknowledging that dicta in Lewy v. Remington Arms Co., 836 F.2d 1104, 111-12 (8th Cir. 1988), had articulated a "knew or should have known" negligence standard for imposition of the sanction, the Eighth Circuit ultimately rejected that approach, and held that "there must be a finding of intentional destruction indicating a desire to suppress the truth" before an adverse inference instruction is justified. Id. at 746. Though observing that the case before it "test[ed] the limits of what we are able to uphold as a bad faith determination," the Stevenson court held that the district court did not abuse its discretion in finding that Union Pacific acted with the requisite intent to destroy evidence for the purpose of suppressing evidence. Id. at 747-48.

Plaintiffs suggest that this court should follow the more recent holding in Stevenson which suggests that a drastic sanction such as the exclusion of expert testimony be imposed when the facts support a finding of bad faith, which is not present in this case. Plaintiffs reiterate that they did not have counsel shortly after the accident to advise them against the potentially adverse ramifications of salvaging the tractor wreckage. They note that Mrs. Meredith testified at her deposition that she asked that the taper leaf spring be preserved because it was suspected of possibly having played a role in her husband's accident, but that she felt that the issue of salvage was not her choice. They further note that there is no evidence that plaintiffs' insurer had anticipated that litigation would arise from the accident at the time the tractor was salvaged.

Plaintiffs also dispute defendants' claim of severe prejudice. They note that notwithstanding

14

Monick's inability to fulfill his 13 point list, Monick has published a report and testified that the subject taper leaf spring could not have failed as alleged by plaintiffs. Likewise, defendants other metallurgist experts have issued reports and proffered opinions that the subject leaf spring is not defective and that it could not have played a causative role in the accident. The same holds true for the retained product engineer expert.

Plaintiffs contend the tractor wreckage would be of little value anyway because the wreckage was subjected to significant additional damage and movement in the course of the rescue and recovery operations, and it is highly unlikely that anyone would be able to draw any reasonable conclusions from any examination of its post-recovery condition. Plaintiffs suggest that if any sanction is considered, that it be the adverse inference jury instruction.

Defendants reply that this court should follow a district court case, Moyers v. Ford Motor Co., 941 F.Supp. 883, 885 (E.D. Mo. 1996), which held that dismissal is appropriate when the destruction of evidence by plaintiff renders a full defense impossible. They also maintain the facts suggest a sufficiently strong inference of intent supporting the entry of spoilation sanction under Stevenson. They state the record shows litigation was planned by the Merediths early on, noting (1) the Merediths' sons took picture of the tractor days after the accident; (2) Mrs. Meredith, as well as Mr. Ezra, insisted the taper leaf spring be saved and tool great car that it be preserved but allowed the disposal of the truck and its components before any opposing party had an opportunity to review and inspect that evidence; (3) the Merediths went to view the final condition of the truck; (4) Fireman's Fund hired Mark Ezra to determine if a mechanical failure was the accident's cause; (5) plaintiffs and their insurance company knew litigation was a possibility in the context of vehicle accidents; and (6) Mrs. Meredith had previously been a plaintiff in a lawsuit in which she was rear

ended.

Defendants also argue the retention of the left taper leaf spring is insufficient for them to present a full defense to plaintiff's theory of the case because the tractor is directly relevant to determining the cause of the accident. They state that an adverse inference instruction will not adequately reduce the unfairness to them resulting from plaintiffs' failure to preserve relevant and critical evidence.

Possible sanctions for the failure to preserve evidence include (1) a jury instruction on the "spoliation inference," an inference which permits the jury to assume that the destroyed evidence would have been unfavorable to the position of the offending party; (2) the exclusion of certain evidence of the offending party; or (3) entry of judgment in favor of the prejudiced party. Moyers v. Ford Motor Co., 941 F.Supp. 883, 884 (E.D. Mo. 1996). In light of the facts of this case, the Court in its discretion believes an adverse inference instruction for the jury is the appropriate remedy for the spoliation of the tractor in this matter. On these facts, the court is unable to make a finding of "intentional destruction indicating a desire to suppress the truth" as required under Stevenson. The Court also believes Stevenson is distinguishable, however, in that it involved a routine document retention policy which was not the case here. With an adverse inference instruction the jury is instructed that they may, but are not required to, conclude that the evidence at issue would have been detrimental to plaintiff's case. The parties may present the evidence regarding spoliation to the jury along with the case, and decide, what if any, weight to give defendants' assertions that the tractor wreckage would have been exculpatory. In light of this conclusion, the Court will deny defendants' motion to dismiss for spoliation of evidence.

Accordingly,

**IT IS HEREBY ORDERED** that defendants' motion to exclude the testimony of Mark Ezra is **DENIED**. (Doc. 54)

**IT IS FURTHER ORDERED** that defendants' motion to exclude the testimony of James Briem is **DENIED**. (Doc. 55.)

**IT IS FURTHER ORDERED** that defendants' motions for a <u>Daubert</u> hearing are **DENIED**. (Doc. 59, 66.)

**IT IS FURTHER ORDERED** that defendants' motion to dismiss is **DENIED.** (Doc. 66.)

                                              **CHARLES A. SHAW**
                                              **UNITED STATES DISTRICT JUDGE**

Dated this <u>18th</u> day of August, 2005.